UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KB HOME, a Delaware corporation; KB HOME COASTAL INC., a California corporation; KB HOME GREATER LOS ANGELES INC., a California corporation; and KB HOME SOUTH BAY INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ILLINOIS UNION INSURANCE COMPANY, DOES 1-50, inclusive,<br><br>Defendants. | Case No. 8:20-cv-00278-JLS-JDE<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT AS TO ALL PLAINTIFFS (Doc. 61)** |

Before the Court is a Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment as to All Plaintiffs. (Mot., Doc. 61.) Plaintiffs KB Home, KB Home Coastal Inc., KB Home Greater Los Angeles Inc., and KB Home South Bay Inc. (collectively, "Plaintiffs") opposed, and Defendant replied. (Opp., Doc. 80; Reply, Doc. 89.) Having considered the parties' briefs and held oral argument, the Court now DENIES Defendant's Motion.

## I.  BACKGROUND[1]

The facts stated herein are undisputed unless otherwise noted. The dispute in this case concerns a commercial insurance policy (the "Policy") issued by Defendant to KB Home (and its co-plaintiff subsidiaries) for the March 1, 2015 to March 1, 2017 policy period. (Ex. 1 (Policy) to the Declaration of Lei Huang, Doc. 61-2.)

KB Home and its co-plaintiff subsidiaries build large single-family homes throughout the United States including in California. (Defendant's Objections to Plaintiffs' Statement of Uncontroverted Facts ("D's Objs. to Plaintiff's Statement") ¶¶ 24, 32, Doc. 90.) KB Home, as the parent company, borrows funds for such construction through issuance of Senior Notes that bear interest. (*Id.* ¶ 103.) KB Home's subsidiaries are permitted to draw on the constructions funds to build homes. (*Id.* ¶ 104; Plaintiffs' Statement of Genuine Disputes in Opposition to Defendant's Motion ("Ps' Statement of Genuine Disputes") ¶¶ 10-11, Doc. 81.) The subsidiaries, according to Plaintiffs, are required by principles of accounting to capitalize the interest as a charge against their profit. (D's Objs. to Plaintiff's Statement ¶ 104, Doc. 90.) However, the interest paid by

---

[1] In its submissions, Defendant has provided largely boilerplate evidentiary objections. In such instances, it is "unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). Thus, insofar as the Court relies on objected-to evidence, the relevant objections are overruled. *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, n.1 (C.D. Cal. 2010).

the subsidiaries is paid to KB Home. (*See*, *e.g.*, Ex. 6 (Oct. 28, 2021 Michael Gartlan Depo.) at 102:5:9, Doc. 61-4.)

As is typical of large single-family homebuilders, KB Home's business model consists of *first* performing site development work, *then* building model homes to drive sales once the site is properly developed, and *then* building homes in phases as homes are sold. (D's Objs. to Plaintiff's Statement ¶ 27, Doc. 90.) Given KB's Home's business model, KB Home does not set a formal construction schedule at the outset for every home in each community. (*Id.* ¶ 28.) However, KB Home does prepare in-house projections of sales, starts, and closings, which KB Home changes if completion of the site development works gets delayed. (*Id.* ¶ 9.) For example, KB Home's projections for a particular community shows when KB Home expects construction to begin on a model home, when the model home is opened, when KB Home expects first sales to begin, and when it expects home production to start. (*See*, *e.g.*, Ex. 10 (to the Declaration of Mike Gartlan) at PDF Page 15, Doc. 85-10.)

In January 2017, rainstorms damaged Plaintiffs' ongoing construction sites throughout California. (D's Objs. to Plaintiff's Statement ¶ 32, Doc. 90.) When the rainstorms hit, many of the impacted sites were in the land development stage where grading is being performed, utilities and drainage are installed, roads are built, and no homes are yet under construction. (*Id.* ¶ 35.) The worst damaged sites were not yet connected to city or county drainage systems. (*Id.*) As a result, rain had nowhere to run off and flooded the sites. (*Id.*) As Defendant's in-house adjuster stated in his report regarding the rainstorms' impact on Plaintiffs' ongoing construction sites, Plaintiffs "had to start all over in terms of site development." (*Id.* ¶ 92.) The rainstorms delayed site development for various communities, and the delays were recorded in the months. (*See*, *e.g.*, *id.* ¶ 45.)

Due to the damaged caused by the rainstorms, Plaintiffs submitted a claim for coverage under its Policy with Defendant. (*Id.* ¶¶ 33-34.) Plaintiffs sought coverage under

the Policy for hard costs (i.e. those costs arising from repairing property damage to the sites), which Defendant paid. (*Id.* ¶ 33.) Plaintiffs also sought coverage for soft costs—the costs at issue in this action—under the Policy's Soft Costs and Rental Income Coverage (sometimes referred herein as the "Provision"). (*Id.*) The Provision provided the following relevant information regarding soft costs:

**PART F**
**SOFT COST AND RENTAL INCOME COVERAGE**

1. SOFT COST AND RENTAL INCOME COVERAGE-

    A. Coverage

    When a sublimit of Liability is shown in the Declarations for SOFT COST and/or RENTAL INCOME coverage as defined below, the Company will pay for those necessary additional expenses which would not have otherwise been incurred but for a delay in the projected completion date of an Insured Project(s). This delay must be caused by or be the result of direct physical loss or damage to covered property.

    SOFT COSTS mean only those expenses relating to Covered Property consisting of:

    1. Advertising and promotional expenses . . .

    7. Interest and fee(s) on the construction loan;

    8. Realty taxes and other assessments

    . . .

    The Company will pay for the delay in the completion date of a building or structure from the projected completion date for up to 12 months, providing the loss occurs while this coverage is in effect.

(Ex. 1 (Policy) at PDF Pages 33-34, Doc. 61-2.) Pursuant to the Provision, Plaintiffs sought reimbursement for, among other things, additional real estate taxes, construction loan interest, and advertising and promotional expenses that

1  Plaintiffs allegedly incurred due to construction delays caused by the rainstorms.
2  (*See*, *e.g.*, Declaration of Alan H. Packer ("Packer Decl.") ¶¶ 12, 26, Doc. 84; Ex.
3  30 (South Bay Division Soft Cost Claim), Doc. 84-4.)
4       As support for their contention that they suffered softs costs due to the delays
5  caused by the rainstorms, Plaintiffs provided evidence of the costs they incurred.
6  (*See*, *e.g.*, D's Objs. to Plaintiff's Statement ¶¶ 28-29; 48-61, Doc. 90; Declaration
7  of Mike Gartlan ¶¶ 21, 24, Doc. 90; Packer Decl. ¶ 43, Doc. 84.)  For example, in
8  Plaintiffs' first soft cost coverage submission to Defendant in 2017, Plaintiffs noted
9  that they incurred $91,604 in advertising costs for the months-long delay in site
10 development for the Lexington community project.  (*See* Ex. 1 (to the Declaration
11 of Mike Gartlan) at PDF Pages 4, 10, Doc. 85-1.)
12      Additionally, according to Plaintiffs, the rainstorms delayed site
13 development, which in turn delayed delivery of the first home in the Lexington
14 community.  (*Id.* at PDF Page 10; Ex. 1 (to the Declaration of Glenn Taylor
15 ("Taylor Decl.") at PDF Page 27, Doc. 88-1.)  More broadly, Plaintiffs note that the
16 rainstorms delayed site development as evidenced by delays in the slab starts at
17 most of the communities.  (Ex. 1 (to the Taylor Decl.) at PDF Page 8, Doc. 88-1.)
18 Plaintiffs' expert, Glenn Taylor (a licensed contractor), noted the slab starts
19 constitutes the start of the construction phase for the communities.  (Taylor Decl.
20 ¶ 20, Doc. 88; Ex. 1 (to the Taylor Decl.) at PDF Page 10, Doc. 88-1.)  Plaintiffs
21 characterize the soft costs they incurred during this delay period as "unavoidable
22 carrying costs."  (Opp. at 10, 20, Doc. 80.)
23      Defendant assembled a team to investigate and adjust Plaintiffs' soft costs
24 claim. (D's Objs. to Plaintiff's Statement ¶ 41, Doc. 90.)  The team investigated the
25 claim for over two years, visited virtually every affected site, documented damages,
26 monitored repairs, audited repair costs, met frequently with KB Home, asked for
27 and received information directly from KB Home, and issued reports to Defendant's
28

5

adjuster. (*Id.* ¶ 42.) During those years, Defendant's adjusting team interfaced directly with KB Home and directed Plaintiffs as to what information the team needed to investigate the soft costs claim, all the while reporting to Defendant on the information requested and provided. (*See*, *e.g.*, *id.* ¶¶ 43, 49, 65-66.) Plaintiffs cooperated in the two-year long investigation. (*Id.* ¶ 38.) Indeed, Plaintiffs attest that "[t]he volume of documentation . . . provided to Chubb and its adjusting team was massive," totaling thousands of pages of documents. (Gartlan Decl. ¶ 16, Doc. 85.) On February 15, 2019, the investigating team recommended that Defendant pay the full sublimit in the policy for "Soft Costs." (D's Objs. to Plaintiff's Statement ¶ 69.) Defendant, however, disagreed with the team's recommendation and denied Plaintiffs' claim.

On November 19, 2019, Plaintiffs filed a Complaint in the Superior Court of California (County of Orange) alleging the following claims against Defendant: (1) Breach of Written Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; and (3) Declaratory Relief. (Complaint, Doc. 1-1.) Plaintiffs allege that Defendant "ignored the recommendation of [its] own Agents, and unreasonably and unjustifiably refused to pay [Plaintiffs] even a dollar towards its undisputed incurred Soft Cost losses." (*Id.* ¶ 26.) Plaintiffs contend that Defendant's "unjust and unreasonable actions . . . violate the Policy, as well as long-standing California law governing insurance claims." (*Id.* ¶ 32.) Defendant removed the case to this Court on February 10, 2020. (Doc. 1.)

Defendant now seeks summary judgment or partial summary judgment as to Plaintiffs' claims in this action. (Mot., Doc. 61.)

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6

Fed. R. Civ. P. 56(a); *see also Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079-80 (9th Cir. 2004) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(c))). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010). A fact is "material" when its resolution "'might affect the outcome of the suit under the governing law.'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

"Where the party moving for summary judgment would bear the burden of proof at trial, that party 'has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.'" *Bernstein v. Virgin Am., Inc.*, 365 F. Supp. 3d 980, 984 (N.D. Cal. 2019) (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)). By contrast, when the moving party would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

"If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists." *Bernstein*, 365 F. Supp. 3d at 984 (citing *Nissan Fire*, 210 F.3d at 1102). "If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment." *Bernstein*, 365 F. Supp. 3d at 984 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the United States Supreme Court has held

1 that "[t]he mere existence of a scintilla of evidence in support of the non-moving party's
2 position is not sufficient." *Anderson*, 477 U.S. at 252. Genuine factual issues must exist
3 that "can be resolved only by a finder of fact because they may reasonably be resolved in
4 favor of either party." *Id*. at 250.

5 When ruling on a summary judgment motion, the Court must examine all the
6 evidence in the light most favorable to the non-moving party. *Celotex*, 477 U.S. at 325.
7 Moreover, the Court cannot engage in credibility determinations, weighing of evidence, or
8 drawing of legitimate inferences from the facts; these functions are for the jury. *Anderson*,
9 477 U.S. at 255. Without specific facts to support the conclusion, a bald assertion of the
10 "ultimate fact" is insufficient. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 990-91 (9th Cir.
11 1991).

### III.   DISCUSSION

Defendant argues that this Court should summary judgment or partial summary judgment on Plaintiffs' claims in this action for several reasons. (*See*, *e.g.*, Mot. at 12-17.) The Court addresses Defendant's arguments below.

### A.   Whether the Soft Costs and Rental Coverage Provision Applies to Plaintiffs' Claim

*First*, Defendant argues that this Court should enter judgment in its favor because the Soft Costs and Rental Coverage provision "only covers delays in completion of the entire Projects, not individual houses," and KB Home cannot "prove that the [rainstorms] caused a delay in the completion of any of its Projects." (*Id.* at 7, 12.) Under California law, which the parties do not dispute applies here, "[i]nterpretation of an insurance policy is a question of law" and "the ordinary rules of contractual interpretation apply." *Travelers Prop. Cas. Co. of Am. v. Superior Ct.*, 215 Cal. App. 4th 561, 574 (2013). Under ordinary rules of contract interpretation, "'the mutual intention of the parties at the time the contract is formed governs interpretation.'" *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,

32 Cal. 4th 465, 470 (2004).  The parties' mutual intention "is to be inferred, if possible, solely from the written provisions of the contract." *Id.*  Moreover, "[l]anguage in an insurance policy is interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.* (internal quotation marks omitted).  Ambiguous terms in the insurance policy "'are resolved in the insureds' favor, consistent with the insureds' reasonable expectations.'" *Id.* at 471.

As an initial matter, the Court disagrees with Defendant's interpretation that the Provision "only covers delays in completion of the entire Projects, not individual houses." (Mot. at 12, Doc. 61.)  The Provision provides that Plaintiffs are entitled to soft costs coverage if they can show, among other things, "a delay in the projected completion date of an Insured Project(s)." (Ex. 1 (Policy) at PDF Page 34, Doc. 61-2.)  Nowhere in the Policy is the term "Insured Project" defined nor does the Policy contain language suggesting that "Insured Project" refers to an entire community within a project.  Instead, the Provision illustrates that Insured Project encompasses delays as to individual homes within a project.  For example, the Provision states that Defendant "will pay for the delay in the completion date of a building or structure from the projected completion date for up to 12 months, providing the loss occurs while this coverage is in effect." (*Id.* at PDF Page 33.)  Moreover, the Provision states "as a condition precedent" to soft cost coverage, "the Insured will make every attempt to reduce the resultant delay in the completion of a building or structure." (*Id.*)

Indeed, Defendant's interpretation would read out of the contract the Provision's references to "building or structure." *See also Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) ("'The language of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" (citing Cal. Civ. Code § 1641)); *see also Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 994 (N.D. Tex. 2018) (rejecting argument that the soft costs and rental income provision was inapplicable because "the Weather Event did not delay

1  construction of the overall KPMG Plaza" as "[t]he Policy does not define covered
2  'building or structure' with reference to the jobsite description" and "evidence of delay to
3  the construction of 'materials and supplies that will become a permanent part of the
4  buildings or the structures' of KPMG Plaza is sufficient to avoid dismissal" of the breach
5  of contract claim).  Therefore, the Court declines to adopt Defendant's interpretation of the
6  Policy.

7  In addition, the Court declines to grant summary judgment in Defendant's favor on
8  the basis that Plaintiffs cannot "prove that the [rainstorms] caused a delay in the
9  completion of any of its Projects." (Mot. at 12, Doc. 61.)  As noted above, the Policy does
10 not condition soft coverage on whether Plaintiffs can show "delay in completion of" an
11 entire Project. (*Id.*)  Moreover, Plaintiffs have submitted evidence that the rainstorms
12 delayed site development work, which caused Plaintiffs to change in-house projections of
13 sales, starts, and closings. (*See*, *e.g.*, D's Objs. to Plaintiff's Statement ¶¶ 28-29; 48-61,
14 Doc. 90; Declaration of Mike Gartlan ¶¶ 21, 24, Doc. 90; Declaration of Alan H. Packer
15 ¶ 43, Doc. 84.)  A jury could reasonably conclude that Plaintiffs have established the
16 rainstorms caused a delay in the completion of a "building or structure" under the Policy.
17 The remaining issue, however, is whether Plaintiffs have sufficient evidence to show that
18 they incurred "necessary additional expenses which would not have otherwise been
19 incurred but for a delay in the projected completion date."  The Court addresses that issue
20 in the sections below.

**B.     Whether Plaintiffs' Soft Cost Claim for Construction Loan Interest Fails**

24 Under the Provision, soft costs include "[i]nterest and fee(s) on the construction
25 loan." (Ex. 1 (Policy) at PDF Page 33, Doc. 61-2.)  The evidence reflects that Plaintiffs do
26 not borrow funds using a traditional lender.  Instead, KB Home, the parent entity, borrows
27 funds at the corporate level through the issuance of Senior Notes that bear interest. (D's
28 Objs. to Plaintiff's Statement 103, Doc. 90.)  The interest Plaintiffs claim under the

10

Provision comprises interest paid by Plaintiffs KB Home South Bay Inc., KB Home Coastal Inc., and KB Greater Los Angeles, Inc. to Plaintiff KB Home during the period of delay caused by the rainstorms. (*See*, *e.g.*, Ps' Statement of Genuine Disputes ¶¶ 10-11, Doc. 81.)

Defendant argues that Plaintiffs' soft cost claim for construction loan interest fails for several reasons. First, Defendant implies that the construction loan needed to be a traditional third-party loan, and that interest payments from the divisions to the corporate entity are insufficient to constitute a construction loan. (Mot. at 13, Doc. 61 ("Plaintiffs' transfer of internal credits from KB Home Divisions to KB Home Corporate does not constitute "necessary additional expenses" for "construction loans. . . .").) Second, Defendant argues that even if the interest paid through "internal policies" constitutes interest on a "construction loan," the undisputed evidence reflects that no interest costs were incurred because "KB Home never paid additional interest on its Senior Notes due to repairs." (*Id.* at 15.) Specifically, Defendant contends that Plaintiffs cannot show that there was additional interest incurred due to the damage from the rainstorms because "KB Home pays off Senior Notes when they come due, and KB Home did not delay any payments on the Senior Notes or accrue any additional interest on the Senior Notes due to the" rainstorms. (Mot. at 14-15, Doc. 61.)

Plaintiffs acknowledge "that the parent company (KB Home) did not issue additional senior notes or extend any maturity dates as a result of the storms" but note that "[e]ach individual subsidiary" nonetheless "incurred additional interest during the period of delay." (Opp. at 28, Doc. 80.) As support, Plaintiffs cite to testimony and expert reports supporting their claims. (D's Objs. to Plaintiff's Statement ¶ 108, Doc. 90.) For example, Plaintiffs cite to an expert report provided by Michael Farkas "who worked for over twenty years in various corporate accounting roles," "spent over seven years working for William Lyons, a publicly traded residential homebuilder that built homes across the Western United States," and served as William Lyon Homes Vice President Corporate

11

Controller. (Ex. 1 (Expert Report of Michael Farkas) at PDF Page 3, Doc. 86-1.) Mr. Farkas concluded that the rainstorms "caused delays in construction while repairs occurred and while the sites were brought back to a pre-Rain Event condition where construction activities could take place, thereby elongating the period under which the projects in question were under construction, including the site development work." (*Id.* at PDF Page 13.) According to Mr. Farkas, "[h]ad the work been completed according to the same pace as it was being achieved prior to the Rain Event, the funds generated through the sale of the homes could have been . . . used to pay down" the Senior Notes. (*Id.*) Therefore, Mr. Farkas contends, "the division incurred more interest than had the Rain Event not happened." (*Id.*; *see also* Ex. 6 (Oct. 28, 2021 Michael Gartlan Depo.) at 123:10-17, 127:21-130:7 (highlighting KB Home's business practice of paying down senior notes based upon cash generated at the division level), Doc. 61-4.)

A reasonable jury could conclude that based on the evidence submitted by Plaintiffs that the operating insureds (KB Home South Bay Inc., KB Home Coastal Inc., and KB Home Greater Los Angeles Inc.) had to pay more interest than they would have if the rainstorms did not occur. Moreover, as the policy does not define "construction loan," any ambiguity in characterizing the type of financing that is covered should counsel for an interpretation in favor of the insured. Accordingly, summary judgment as to this claim is denied.

### C. Whether Plaintiffs' Soft Cost Claim for Additional Real Estate Taxes and Marketing Expenses Fails

Defendant argues that Plaintiffs' "claims for additional real estate taxes and marketing expenses incurred" fail "both due to KB Home's inability to show a delay in the Projects' projected completion dates, and because the real estate taxes and advertising expenses incurred during the [rainstorms] were no higher than they would have been had no [rainstorms] occurred." (*Id.* at 16.) Under the Provision, Plaintiffs also seek coverage for advertising expenses and property taxes incurred during the rain event up until the

12

point that the sites had been returned to their pre-rainstorm condition. (*See*, *e.g.*, Ps' Statement of Genuine Disputes ¶¶ 17-18, Doc. 81.)

As to the real estate taxes requests, Defendant contends that "KB Home would have had to pay those taxes in the same amount regardless of whether the Rain Event had occurred." (Mot. at 16 (citing Gartlan Depo. 146:24-147:7), Doc. 61.) As its primary support, Defendant cites to testimony from KB Home's Senior Vice President of Finance Mike Gartlan. (*See*, *e.g.*, *id.*) In the cited testimony, Gartlan testified, among other things, that property taxes would have increased because the time period in which Plaintiffs would have had to pay for property taxes would have been elongated due to the delays. (*Id.*) The cited testimony does not establish that the amount owed in property taxes would have been the same regardless of the rain event. *See*, *e.g.*, *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000) ("In order to carry its ultimate burden of persuasion on the motion, the moving must persuade the court that there is no genuine issue of material fact."). Indeed, Plaintiffs have proffered evidence that the rainstorms delayed site development, which for some sites, delayed sale of the first home. *See supra* p. 3.

Defendant also argue that Plaintiffs' claims for advertising and marketing costs fail in that Plaintiffs have not produced any evidence that they incurred advertising and marketing costs due to the rainstorms. (Mot. at 16, Doc. 61.) Defendant notes, for example, that "KB Home continued to advertise, market and sell houses throughout the Rain Event." (*Id.*) Again, however, Plaintiffs have proffered evidence that site development was delayed, which led to delays in the construction of a "building or structure." *See*, *e.g.*, *supra* p. 3. A reasonably jury could find that because of the delay in the site development, Plaintiffs incurred advertising costs during a period they otherwise would not have had to pay for but for the rainstorms. On these grounds, the Court declines to find that Plaintiffs' advertising claims fail.

### D. Whether Plaintiffs' Bad Faith Claim Fails

Lastly, Defendant argues that Plaintiffs' bad faith claim fails because (1) "there is no coverage for KB Home's Soft Cost claims" and (2) "Defendant is entitled to judgment of KB Home's bad faith claim based on the genuine dispute doctrine." (Mot. at 17, Doc. 61.) As to Defendant's first argument, the Court has already concluded that there exist triable issues of fact as whether there exists coverage for Plaintiffs' soft cost claim. *See, e.g.*, *supra* pp. 8-13.

The Court also finds that the genuine dispute doctrine does not defeat Plaintiffs' bad faith claim. "[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1073 (2007). However, the genuine disputes doctrine does not preclude a bad faith claim where the insurer fails to thoroughly investigate all bases for coverage. *Id.* at 1073-74. This is because, under California law, "an insurer owes a duty to its insured to investigate *all* the possible bases of an insured's claim." *Id.* at 1073; *see also id.* ("'An insurance company may not ignore evidence which supports coverage'" and "'[i]f it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing.'"). Therefore, where an insurer fails to conduct a thorough investigation regarding all possible bases for coverage, including under the insurer's interpretation of coverage, the insurer cannot claim a "genuine dispute" applies because "by failing to investigate, it has deprived itself of the ability to make a fair evaluation of the claim." *Id.* at 1074; *see Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 881 (Mar. 29, 2000) (holding that the record supported a finding of bad faith where the record suggested that the insurer "looked the other way when confronted with facts revealing the possibility of first-party coverage, resisting both reasonable interpretation of policy language and a compelling history of negotiation to secure this coverage").

14

Here, a jury could find that Defendant failed to conduct a thorough investigation as to whether Plaintiffs were entitled to soft cost coverage under its interpretation of the Provision. *See Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1163 (9th Cir. 2002). The record illustrates that Plaintiffs, over the course of the two-year investigation, fully cooperated with Defendant's adjusting team investigating Plaintiffs' soft cost claim. *See supra* pp. 5-6. Moreover, it is undisputed that when Plaintiffs' adjusting team required certain information to investigate the soft cost claim, Plaintiffs provided that information. *Id.* KB Home's Senior Vice President, during his deposition testified, however, that certain information that Defendant now seeks to adjudicate the soft cost claim under its interpretation of the Provision was never requested during the two-year long investigation, although Plaintiffs could have provided such information. (*See, e.g.*, Ex. 6 (Oct. 28, 2021 Michael Gartlan Depo.) at 148:5-15, 153:4-24, Doc. 61-4.) A reasonable jury could conclude that Defendant's decision to deny soft cost coverage was based on an inadequate investigation of the facts surrounding Plaintiffs' soft cost claim. *See Amadeo*, 290 F.3d at 1163.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion.

DATED:  August 23, 2022

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE